# In the United States Court of Federal Claims

No. 18-371C
(Filed:  June 8, 2020)

```
*************************************
```
CSS, LLC,                          *
                                   *     Motion to Dismiss; RCFC 12(b)(1); RCFC
            Plaintiff,             *     12(b)(6); Jurisdiction; Standing; Direct
                                   *     Claims; Instrumentalities; Coercion; Agent;
v.                                 *     Conservators; Conflict of Interest; Third-
                                   *     Party Beneficiaries; Stock; Shareholders;
THE UNITED STATES,                 *     Fannie; Freddie; FHFA
                                   *
            Defendant.             *
```
*************************************
```

<u>Lawrence D. Rosenberg</u>, Washington, DC, for plaintiff.

<u>Kenneth M. Dintzer</u>, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY,** Chief Judge

Plaintiff in this case challenges the actions of the United States during the conservatorships of the Federal National Mortgage Association ("Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie").  Specifically, plaintiff takes issue with the conservator for Fannie and Freddie (collectively, the "Enterprises") amending a funding agreement between the Enterprises and the United States Department of the Treasury ("Treasury").  Based on the revisions to that agreement, plaintiff seeks the return of money illegally exacted, damages for breach of contract and breach of fiduciary duty, and compensation for a taking pursuant to the Fifth Amendment to the United States Constitution ("Constitution").  Defendant moves to dismiss plaintiff's amended complaint, arguing that the court lacks subject-matter jurisdiction over plaintiff's claims, plaintiff lacks standing to pursue its claims, and plaintiff fails to state a claim upon which relief may be granted.  For the reasons stated below, the court grants defendant's motion to dismiss.

## I.  BACKGROUND

### A.  The Enterprises are private companies that are under the control of a conservator.

#### 1.  The Enterprises operated independently before the financial crisis.

Congress created the Enterprises to help the housing market; the Enterprises purchase and guarantee mortgages originated by private banks before bundling those mortgages into securities

that are sold to investors.[1]  1st Am. Compl. ¶¶ 16-17; Fairholme II, 147 Fed. Cl. at 15.  Congress chartered Fannie in 1938 and established Freddie in 1970.  1st Am. Compl. ¶¶ 16-17.  Both Enterprises were initially part of the federal government before Congress reorganized them into for-profit companies owned by private shareholders.  Id.  Freddie is organized under Virginia law, and Fannie is organized under Delaware law.  Id.  The Enterprises issued their own common and preferred stock.  Id. ¶ 19.  Common shareholders obtained the right to receive dividends, collect any residual value, and vote on various corporate matters.  Fairholme II, 147 Fed. Cl. at 15.  Those owning preferred stock, including plaintiff in this suit, acquired the right to receive dividends and a liquidation preference.  1st Am. Compl. ¶ 19.

The Enterprises, up until the financial crisis in the late 2000s, were consistently profitable; Fannie had not reported a full-year loss since 1985, and Freddie had not reported such a loss since becoming privately owned.  Id. ¶ 20.  Although the Enterprises began recording losses in 2007, they were stable and adequately capitalized.  Id. ¶¶ 22-23.  Otherwise stated, the Enterprises were not in financial distress or otherwise at risk of insolvency.  Id.

**2. Congress created the Federal Housing Finance Agency to regulate the Enterprises and authorized the agency to serve as a conservator for each Enterprise.**

In the midst of the financial crisis during the summer of 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (codified as amended in scattered sections of 12 U.S.C.).  In that statute, Congress created the Federal Housing Finance Agency ("FHFA") and provided it with supervisory and regulatory authority over the Enterprises.  See 12 U.S.C. § 4511(a)-(b) (2018).[2]  Congress further authorized the FHFA Director to, in limited circumstances, appoint the FHFA as the conservator ("FHFA-C") for each Enterprise to reorganize, rehabilitate, or wind up its affairs.[3]  Id. § 4617(a)(2).  Specifically, the Director is authorized to appoint a conservator if, among other things, an Enterprise consents, is undercapitalized, or lacks sufficient assets to pay its obligations.  Id. § 4617(a)(3).[4]  The conservator, once appointed, functions independently; it is not "subject to the direction or supervision of any other agency of the United States or any State in the exercise of [its] rights, powers, and privileges . . . ."  Id. § 4617(a)(7).

---

[1]  This background section is a less comprehensive version of the court's recitation of facts in a related case, Fairholme Funds, Inc. v. United States, 147 Fed. Cl. 1 (2019) ("Fairholme II"), motion to certify interlocutory appeal granted, 147 Fed. Cl. 126 (2020).

[2]  Congress has not amended the relevant portions of HERA since enacting the law in 2008.  The court, therefore, refers to the most recent version of the United States Code.

[3]  To avoid any ambiguity, the court reiterates that it is using "FHFA" to refer to the agency acting in its regulatory role and "FHFA-C" when discussing the agency acting as a conservator.

[4]  Congress enticed the Enterprises to consent to a conservatorship by insulating their board members from any liability to shareholders or creditors for agreeing in good faith to the FHFA's appointment of a conservator.  12 U.S.C. § 4617(a)(6).

Congress also delineated the scope of the FHFA-C's powers in HERA.  See generally id. § 4617.  As soon as it is appointed, the FHFA-C "immediately succeed[s] to . . . all rights, titles, powers, and privileges of the [Enterprise], and of any stockholder, officer, or director of such [Enterprise] with respect to the [Enterprise] and the assets of the [Enterprise] . . . ."  Id. § 4617(b)(2)(A).  Congress also conferred on the conservator the power to "[o]perate the [Enterprise]."  Id. § 4617(b)(2)(B).  Pursuant to that power, the conservator "may," among other things, "perform all functions of the [Enterprise]," "preserve and conserve the assets and property of the [Enterprise]," and "provide by contract for assistance in fulfilling any function . . . of the [conservator]."  Id.  The conservator "may" also "take such action as may be . . . necessary to put the [Enterprise] in a sound and solvent condition; . . . and appropriate to carry on the business of the [Enterprise] and preserve and conserve the assets and property of the [Enterprise]."  Id. § 4617(b)(2)(D).  Rounding out the panoply of powers, Congress also provided that the conservator "may . . . exercise . . . such incidental powers as shall be necessary to carry out [its enumerated powers]" and "take any action authorized by [12 U.S.C. § 4617(b)], which [it] determines is in the best interest of the [Enterprise] or the [FHFA]."  Id. § 4617(b)(2)(J).  By describing the FHFA-C's role primarily in terms of what powers it "may" exercise, see generally id. § 4617, Congress provided the FHFA-C with significant discretion on when or how it uses its powers, see United States v. Rodgers, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion.").  Simply stated, the FHFA has "extraordinarily broad flexibility to carry out its role as conservator."  Perry Capital LLC v. Mnuchin, 864 F.3d 591, 606 (D.C. Cir. 2017) ("Perry II"), cert. denied, 138 S. Ct. 978 (2018).

### 3. Congress authorized Treasury to purchase securities issued by the Enterprises.

At the same time that it established the FHFA, Congress authorized the Treasury Secretary to buy securities issued by the Enterprises in limited circumstances.  12 U.S.C. §§ 1455(l) (Freddie), 1719(g) (Fannie).  Congress included a sunset clause on this power; the Secretary could not purchase securities after December 31, 2009.  Id. §§ 1455(l)(4), 1719(g)(4).  Until that date, the Secretary was permitted to purchase the securities if he determined that doing so was necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect taxpayers.  Id. §§ 1455(l)(1)(B), 1719(g)(1)(B).  As part of his obligation to protect taxpayers, the Secretary could only purchase securities after considering:

(i)  The need for preferences or priorities regarding payments to the Government.

(ii)  Limits on maturity or disposition of obligations or securities to be purchased.

(iii)  The [Enterprise's] plan for the orderly resumption of private market funding or capital market access.

(iv)  The probability of the [Enterprise] fulfilling the terms of any such obligation or other security, including repayment.

(v)  The need to maintain the [Enterprise's] status as a private shareholder-owned company.

(vi)  Restrictions on the use of [Enterprise] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

Id. §§ 1455(*l*)(1)(C), 1719(g)(1)(C).

### 4.  The FHFA became the conservator for each Enterprise.

Around the beginning of September 2008, the FHFA and Treasury sought to persuade each Enterprise's board of directors to consent to conservatorship.  1st Am. Compl. ¶ 33.  The FHFA told each Enterprise's board that conservatorship would further the interests of the shareholders.  Id.  Around the same time, the FHFA made an offer to each board:  consent to a conservatorship in exchange for the FHFA-C aiming to preserve and conserve the Enterprises' assets, attempting to restore the Enterprises to sound and solvent condition, and terminating the conservatorships when those goals were achieved.  Id. ¶¶ 5, 7; Fairholme II, 147 Fed. Cl. at 17.  Each Enterprise's board accepted that offer and consented to a conservatorship on September 6, 2008, with an understanding that the FHFA-C would operate in the aforementioned limited ways.  Fairholme II, 147 Fed. Cl. at 17.

The conservatorships became effective on September 6, 2008, upon each Enterprise's board's consent.  1st Am. Compl. ¶¶ 33-34; see also 12 U.S.C. § 4617(a)(3)(I) (permitting the FHFA Director to appoint a conservator when "[t]he [Enterprise], by resolution of its board of directors or its shareholders or members, consents to the appointment").

### 5.  The FHFA-C contracted with Treasury to obtain funding for the Enterprises.

On September 7, 2008, the FHFA-C entered into a Preferred Stock Purchase Agreement ("PSPA") with Treasury for each Enterprise.  1st Am. Compl. ¶ 6.  Treasury entered into the agreements pursuant to its authority under HERA to buy the Enterprises' securities.  Id. ¶¶ 6, 35.  Under the PSPAs, Treasury committed to provide up to $100 billion to each Enterprise to ensure that the Enterprises maintained a positive net worth.  Id. ¶ 35.  If an Enterprise's liabilities exceeded its assets, then the Enterprise could draw on Treasury's funding commitment in an amount equal to the difference between the Enterprise's liabilities and assets.  Fairholme II, 147 Fed. Cl. at 17.

In return for Treasury's funding commitment, the Enterprises surrendered stock, dividends, commitment fees, and control.  First, with respect to the stock, Treasury acquired one-million shares of preferred stock in each Enterprise and warrants to purchase 79.9% of their respective common stock at a nominal price.  1st Am. Compl. ¶ 35.  Treasury's preferred stock had an initial liquidation preference of $1 billion, but the amount increased dollar-for-dollar when an Enterprise drew on Treasury's funding commitment.  Id.  In the event of a liquidation, Treasury was entitled to recover the full liquidation value of its shares before any other shareholder would receive compensation.  Id.  Second, Treasury bargained for the right to a

quarterly cash dividend that would be equal, per annum, to 10% of its liquidation preference. Id. An Enterprise that decided against paying a cash dividend in a specific quarter could make an in-kind payment: the value of the dividend would be added to the liquidation preference, and the dividend rate would increase to 12%. Id. Third, Treasury received the right to a quarterly commitment fee from each Enterprise, but Treasury could waive the fee each year. Id. ¶¶ 35, 41. Fourth, Treasury obtained de facto control over various aspects of each Enterprise; the Enterprises needed to obtain Treasury's consent before awarding dividends, issuing stock, transferring assets, incurring certain types of debt, and making certain organizational changes. Id. ¶ 36.

The FHFA-C and Treasury amended each Enterprise's PSPA on May 6, 2009, to increase Treasury's funding commitment to each Enterprise from $100 billion to $200 billion. Id. ¶ 43. On December 24, 2009, the FHFA-C and Treasury executed another amendment to the PSPAs; they abolished the specific dollar cap and replaced it with a formula to allow Treasury's total commitment to each Enterprise to exceed $200 billion. Id. ¶ 44.

### 6. The Enterprises' finances improved during their conservatorships.

In the early stages of the conservatorships, each Enterprise's net worth decreased as it reported losses. Fairholme II, 147 Fed. Cl. at 18. Some of the losses resulted from the FHFA-C writing down the value of deferred tax assets.[5] Id. Notwithstanding those on-paper losses, as of late 2009, Fannie had drawn only $60 billion from Treasury, and Freddie had only drawn $51 billion. 1st Am. Compl. ¶ 45.

By 2011 and into 2012, the Enterprises' financial outlooks were promising. In addition to an improvement in the housing market, the Enterprises had improved their financial performance. Id. ¶ 50. They were positioned to further improve their financial condition by revising their valuations of deferred tax assets because of growing profits, and by increasing their earnings due to reduced credit losses. Id. The FHFA-C and Treasury were aware of those forthcoming changes and the Enterprises' improving outlooks. Id. ¶ 8. In August 2012, Treasury and FHFA-C knew that the Enterprises would soon experience improved profitability and received projections reflecting that the Enterprises would have positive comprehensive income in 2012. Id. ¶¶ 51-52. Otherwise stated, the FHFA-C and Treasury knew, by early August 2012, that the Enterprises were poised to generate profits in excess of their respective dividend obligations to Treasury. Id. ¶ 50.

### 7. Treasury and the FHFA-C agreed to a third amendment to the PSPAs.

At an unspecified time prior to August 2012, Treasury and the FHFA-C began considering a third amendment to each PSPA. Treasury was the driving force behind the initiative to amend the PSPAs' terms. Id. ¶¶ 56, 68. Indeed, an FHFA official reported in early

---

[5] A deferred tax asset is an asset that may be used to offset future tax liability. Fairholme II, 147 Fed. Cl. at 18 n.4. A company must write down the value of that deferred asset if it is unlikely to be used to offset future taxable profits. Id. This write down occurs, for example, if a company predicts it will not be profitable in the future. Id.

August 2012 that Treasury was making a "renewed push" to implement a new amendment.  Id. ¶ 64 (quoting the FHFA official).  The FHFA-C learned of the proposed changes before the Enterprises; Treasury informed the Enterprises that the new terms were forthcoming and announced the changes to the Enterprises.  Id. ¶ 66.  Treasury officials who were involved with the process do not recall Treasury making any backup or contingency plans in the event that the FHFA-C rejected the proposed terms.  Fairholme II, 147 Fed. Cl. at 19.  The FHFA-C accepted the changes without advocating for different terms.  Id.

Treasury and the FHFA-C decided to announce the changed terms in mid-August 2012 because, according to Treasury, the Enterprises would be reporting earnings exceeding their dividend obligation at the beginning of that month.  Id.  On August 17, 2012, Treasury and the FHFA-C executed the third amendment to each PSPA ("PSPA Amendment").  1st Am. Compl. ¶¶ 2, 9, 53.  A key component of the amended PSPAs is the requirement—referred to here as the "Net Worth Sweep"—that each Enterprise pay Treasury a quarterly dividend equal to 100% of each Enterprise's net worth (except for a small capital reserve amount) rather than a dividend based on a set percentage of the liquidation preference.[6]  Id. ¶ 53.  Additionally, under the amended PSPAs, the Enterprises are not obligated to pay a periodic commitment fee.  Id. ¶ 64.

### a.  Treasury wanted to ensure that it benefited from the new terms.

With the PSPAs, Treasury sought to secure a more beneficial arrangement for itself, as a representative for taxpayers.  During the lead-up to the PSPA Amendments, a Treasury official acknowledged in an internal communication that the government had resolved to "ensure existing common equity holders will not have access to any positive earnings from the [Enterprises] in the future."  Id. ¶ 56 (emphasis removed) (quoting the document).  Treasury recognized its goal of obtaining all of the Enterprises' profits by executing the PSPA Amendments; it intended to take "every dollar of earnings that [the Enterprises] generate[] . . . to benefit taxpayers."  Id. ¶ 10 (quoting a Treasury announcement).

### b.  The FHFA-C agreed to changes that benefit Treasury.

For its part, the FHFA-C was operating under the belief that Treasury would benefit from the PSPA Amendments.  The FHFA-C prioritized Treasury's interests over the fate of the Enterprises and the interests of their shareholders.  Id. ¶ 76.  Mel Watt—a former FHFA Director—commented at the time that he did not "lay awake at night worrying what's fair to the shareholders."  Id. (quoting an interview).

### c.  Treasury and the FHFA understood that the PSPA Amendments would not facilitate the Enterprises exiting conservatorship.

---

[6]  The capital reserve for each Enterprise started at $3 billion and was set to decrease to $0 by January 2018, but the Enterprises and Treasury agreed in December 2017 to reset the capital reserve amount to $3 billion in the first quarter of 2018.  1st Am. Compl. ¶ 53; Fairholme II, 147 Fed. Cl. at 19 n.5.

Treasury was aware that the new terms of the PSPAs were not conducive to the Enterprises exiting conservatorship.  Treasury acknowledged that its goal was to facilitate the "wind down" of the Enterprises.  Id. ¶ 56 (quoting a Treasury report).  At the time of the PSPA Amendments, Treasury explained that the new deal would ensure that the Enterprises "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."  Id. ¶ 69 (emphasis removed) (quoting Treasury press release).

The FHFA shared a similar sentiment.  The FHFA's former Acting Director, Edward DeMarco, testified before the United States Senate that the PSPA Amendments "reinforce the notion that the [Enterprises] will not be building capital as a potential step to regaining their former corporate status."  Id. ¶ 76 (emphasis removed) (quoting the testimony).  Indeed, the FHFA explained to Congress that its vision for the future included a housing industry without Fannie and Freddie.  Fairholme II, 147 Fed. Cl. at 20.

### d. Treasury has benefited from the PSPA Amendments at the expense of the Enterprises and other shareholders.

There are four significant effects that flowed from the PSPA Amendments.  First, plaintiff lost its economic interests in the Enterprises because, under the new terms, private shareholders can never receive dividends or liquidation distributions.  1st Am. Compl. ¶¶ 2, 9, 88-89.  Second, Treasury acquired plaintiff's economic interests in the Enterprises because Treasury now possesses "the entire value" of the Enterprises.  Id. ¶ 93.  Third, Treasury reaped a windfall of $128.9 billion in comparison to what it would have received absent changes to the PSPAs.  Id. ¶¶ 85-86 (alleging that the Enterprises paid Treasury $223.6 billion under the PSPA Amendments but would have only paid Treasury $94.7 billion under the previous terms).  Fourth, the Enterprises can never be rehabilitated to a sound and solvent condition because, by transferring their profits to Treasury, they will perpetually operate on the brink of insolvency.  Id. ¶¶ 54, 87.

### 8. Treasury and the FHFA are committed to ending the conservatorships.

On March 27, 2019, President Donald J. Trump issued a memorandum in which he directed the Treasury Secretary to develop, "as soon as practicable," a plan for "[e]nding the conservatorships of the [Enterprises] upon the completion of specified reforms . . . ."[7]

---

[7]  The court takes judicial notice of the presidential memorandum because it is a government record published in a reliable source, the Federal Register.  See Murakami v. United States, 46 Fed. Cl. 731, 739 (2000) (noting that the court may take judicial notice of government documents), aff'd, 398 F.3d 1342, 1354-55 (Fed. Cir. 2005); see also Democracy Forward Found. v. White House Office of Am. Innovation, 356 F. Supp. 3d 61, 62 n.2 (D.D.C. 2019) ("[J]udicial notice may be taken of government documents available from reliable sources, such as this 2017 Presidential Memorandum.").  See generally Fed. R. Evid. 201 (discussing judicial notice).  Although a motion to dismiss is normally limited to the allegations in a complaint, the court may consider facts derived from sources subject to judicial notice without converting the motion into one for summary judgment.  Sebastian v. United States, 185 F.3d 1368, 1374 (Fed. Cir. 1999).

-7-

Memorandum on Federal Housing Finance Reform, 84 Fed. Reg. 12,479, 12,479 (Mar. 27, 2019).  The President explained that the plan must include proposals for "[s]etting the conditions necessary for the termination of the conservatorships" and outlined some of those conditions.  Id. at 12,480.  Subsequently, Treasury issued a plan in which it advocated for "begin[ning] the process of ending the [Enterprises'] conservatorships."[8]  U.S. Dep't of the Treasury, Housing Reform Plan Pursuant to the Presidential Memorandum Issued March 27, 2019, at 3 (2019), https://home.treasury.gov/system/files/136/Treasury-Housing-Finance-Reform-Plan.pdf [https://perma.cc/RGH8-N385]; accord id. at 26 ("It is, after 11 years, time to bring the conservatorships to an end.").  As part of the plan to end the conservatorships, Treasury proposed that it and the FHFA consider revising the Net Worth Sweep to allow the Enterprises to retain more of their earnings.  Id. at 26-27.

The FHFA shares Treasury's goals with respect to the conservatorships.  Mark Calabria, the current FHFA Director, testified during his confirmation hearing that he wanted to end the conservatorships.[9]  165 Cong. Rec. S2246 (daily ed. Apr. 4, 2019) (statement of Sen. Crapo) (summarizing testimony).  See generally Nominations of Bimal Patel, Todd M. Harper, Rodney Hood, and Mark Anthony Calabria:  Hearing Before the S. Comm. on Banking, Hous., and Urban Affairs, 116th Cong. 10-40, 74-75, 148-85 (2019) [hereinafter Calabria Testimony] (documenting Mr. Calabria's testimony, statement, and responses to written questions during and after his confirmation hearing).  He also stated that, as FHFA Director, he would seek to increase the amount of capital that each Enterprise retains.  Calabria Testimony, supra, at 150; see also id. at 25 ("I support the idea of having significantly more capital at the [Enterprises].").

### B.  Plaintiff owns Fannie and Freddie stock.

There is one plaintiff in this case:  CSS, LLC ("CSS").  CSS is an Illinois limited liability company.  1st Am. Compl. ¶ 13.  CSS owned Fannie preferred stock and Freddie preferred stock at the time of the Net Worth Sweep.  Id.  The shares owned by plaintiff were primarily purchased after the conservatorships were established in 2008.  Pls.' Corrected Combined Opp'n to Def.'s Omnibus Mot. to Dismiss 1.

### II.  PROCEDURAL HISTORY

Plaintiff filed its complaint on March 8, 2018.  This case was coordinated with similar, related cases assigned to the undersigned judge.[10]  Plaintiff filed its first amended complaint in this case on August 16, 2018.  In its amended complaint, plaintiff presents four claims.  Plaintiff first asserts that the Net Worth Sweep constitutes a Fifth Amendment taking (count I) of its

---

[8]  The court takes judicial notice of Treasury's reform plan because it is a government record available from a reliable source, Treasury's website.  See supra note 7.

[9]  The court takes judicial notice of the relevant testimony because the statements are recorded in government documents.  See supra note 7.

[10]  A fuller recitation of the procedural history of this case and related cases is provided in Fairholme II, 147 Fed. Cl. at 21-23.

economic interest in its stock. Plaintiff next asserts that the Net Worth Sweep constitutes an illegal exaction (count II) of that same economic interest because the (1) FHFA was operating unconstitutionally and (2) FHFA-C and Treasury exceeded their statutory authority when they approved the PSPA Amendments. Plaintiff also pleads a breach-of-fiduciary-duty claim ("fiduciary duty claim") (count III) premised on the Net Worth Sweep being unreasonable, arbitrary, and contrary to the duty owed to CSS as a shareholder. Additionally, plaintiff asserts a breach-of-implied-contract claim (count IV) based on a purported agreement by which the Enterprises consented to the conservatorship in exchange for the FHFA agreeing to preserve the Enterprises' assets with the goal of making them safe and solvent. Specifically, plaintiff asserts that each dividend payment under the Net Worth Sweep constitutes a breach because it depletes the Enterprises' assets in a manner that undermines the goals of conservatorship.

On October 1, 2018, defendant moved to dismiss—in a single, omnibus motion—the claims in this case and eleven related cases before the undersigned.[11] The plaintiffs in each of the twelve cases filed a response brief on their respective dockets; some of the plaintiffs relied on a joint brief filed in six of the cases, others, as is the case here, filed a combined brief for five of the cases in which the plaintiffs are all represented by the same counsel. Defendant filed its omnibus reply brief in each of the cases on May 6, 2019. The parties have fully briefed defendant's motion, and the court held a single oral argument on November 19, 2019, involving the plaintiffs from each of the twelve cases that defendant moved to dismiss. The plaintiffs in those cases collaborated during argument; each plaintiff argued some of the issues. Thus, the court infers that the plaintiff in this case has adopted the favorable arguments made by the plaintiffs in the related cases to the extent that such arguments are relevant.[12] Defendant's motion to dismiss is now ripe for adjudication.

## III. STANDARD OF REVIEW

In ruling on a motion to dismiss a complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), the court generally assumes that the allegations in the complaint are true and construes those allegations in the plaintiff's favor. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). With respect to RCFC 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject-matter jurisdiction. Id. The allegations in the complaint must include "the facts essential to show jurisdiction." McNutt v. Gen. Motors

---

[11] The eleven related cases are Fairholme Funds, Inc. v. United States, No. 13-465C; Washington Federal v. United States, No. 13-385C; Cacciapalle v. United States, No. 13-466C; Fisher v. United States, No. 13-608C; Arrowood Indemnity Company v. United States, No. 13-698C; Reid v. United States, No. 14-152C; Rafter v. United States, No. 14-740C; Owl Creek Asia I, L.P. v. United States, No. 18-281C; Akanthos Opportunity Master Fund, L.P. v. United States, No. 18-369C; Appaloosa Investment Limited Partnership I v. United States, No. 18-370C; and Mason Capital L.P. v. United States, No. 18-529C.

[12] The court addresses in this opinion some arguments that were made primarily by the plaintiffs in the related cases to provide context for the resolution of defendant's motion to dismiss. In addition, to the extent that any of plaintiff's less-developed arguments are not discussed in this opinion, the court found such arguments to be unpersuasive.

Acceptance Corp., 298 U.S. 178, 189 (1936).  And, if such jurisdictional facts are challenged in a motion to dismiss, the plaintiff "must support them by competent proof."  Id.; accord Land v. Dollar, 330 U.S. 731, 735 & n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, . . . the court may inquire by affidavits or otherwise, into the facts as they exist." (citations omitted)).  If the court finds that it lacks subject-matter jurisdiction, it must, pursuant to RCFC 12(h)(3), dismiss the complaint.

A claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if it does not provide a basis for the court to grant relief.  Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy.").  To survive a motion to dismiss under RCFC 12(b)(6), a plaintiff must include in the complaint "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).

## IV.  SUBJECT-MATTER JURISDICTION

The court begins with jurisdiction because it is a "threshold matter."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  Subject-matter jurisdiction cannot be waived or forfeited because it "involves a court's power to hear a case."  Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1868).  Therefore, it is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case."  Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); accord K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1004-05 (Fed. Cir. 2015).  Either party, or the court sua sponte, may challenge the court's subject-matter jurisdiction at any time.  Arbaugh, 546 U.S. at 506; see also Jeun v. United States, 128 Fed. Cl. 203, 209-10 (2016) (collecting cases).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "may not be inferred, but must be unequivocally expressed."  United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003).  Any such waiver must be narrowly construed.  Smith v. Orr, 855 F.2d 1544, 1552 (Fed. Cir. 1988).  The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C. § 1491(a)(1) (2018); White Mountain, 537 U.S. at 472.  However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages."  United States v. Testan, 424 U.S. 392, 298 (1976).  Instead, the substantive right must appear in another source of law, such as a "money-mandating

constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

Defendant challenges the court's jurisdiction to entertain plaintiff's claims on a number of bases. Specifically, defendant argues that plaintiff has not asserted claims against the United States and that the court lacks jurisdiction over the subject matter of certain claims. The court addresses these contentions in turn.[13]

## A. Plaintiff has asserted claims against the United States.

The court first considers whether plaintiff has asserted claims against the United States, a necessary element of jurisdiction in the Court of Federal Claims. As set forth in its amended complaint, all of plaintiff's claims are premised on actions taken by the FHFA-C and Treasury. Defendant argues that the court lacks jurisdiction to consider any claims premised on the FHFA-C's or Treasury's conduct. In response, plaintiff contends that it has asserted claims against the government because (1) Treasury was involved in the challenged conduct, (2) the FHFA-C was coerced by the government, (3) the FHFA-C was the government's agent, and (4) the FHFA-C, in collaboration with Treasury, is a government actor. The court addresses each contention in turn.

## 1. The court cannot exercise jurisdiction based on allegations of Treasury's involvement.

Plaintiff initially argues that the court has jurisdiction over its Fifth Amendment takings and illegal-exaction claims because it has alleged the involvement of Treasury—indisputably a part of the federal government—in the action underlying these claims, i.e., the Net Worth Sweep. Defendant counters that Treasury alone could not have implemented the PSPA Amendments, and Treasury's role as a counterparty to the voluntary agreement with the Enterprises is not sufficient to establish jurisdiction over plaintiff's takings claim. Defendant further asserts that the court's order allowing jurisdictional discovery reflects that plaintiff's allegations concerning Treasury alone are insufficient to confer jurisdiction.

The parties' dispute on the import of allegations concerning Treasury is ultimately immaterial in light of the court's determination, explained below, that the FHFA-C—the other party involved in the PSPA Amendments—is the United States. Nonetheless, the court notes, as defendant asserts, that it implicitly acknowledged in its February 26, 2014 discovery order, issued in Fairholme and related cases, that the allegations concerning Treasury alone were insufficient to support jurisdiction. In that order, the court permitted the plaintiffs in those related cases to conduct fact discovery on whether the FHFA-C was "the 'United States' for purposes of the Tucker Act." Fairholme Funds, Inc. v. United States, 114 Fed. Cl. 718, 721

---

[13] In Fairholme II, the court addressed additional jurisdictional concerns that were not raised or are not implicated in this case. See generally 147 Fed. Cl. at 24-25 (rejecting defendant's contention that the claims of the Fairholme plaintiffs were barred by 28 U.S.C. § 1500), 34-37 (rejecting the contention of a putative intervenor that the Court of Federal Claims lacks jurisdiction to entertain Fifth Amendment takings claims).

(2014).  The aforementioned discovery would have been unnecessary (and unwarranted) if, as plaintiff asserts here, the court has jurisdiction over plaintiff's claims based on its allegations concerning Treasury.

## 2.  The FHFA-C was not coerced into approving the PSPA Amendments.

Plaintiff also argues that the FHFA-C is the United States because the FHFA-C was coerced into approving the PSPA Amendments by Treasury.  Defendant counters that the FHFA-C was not coerced by Treasury because the FHFA-C had a choice of whether to accept or reject the PSPA Amendments.  Defendant asserts that there is no coercion if a party has a choice, regardless of however difficult refusal of a particular option may be.  Indeed, defendant contends that plaintiff fails to proffer any allegations that Treasury required the FHFA-C to enter into the agreements against its will.  Defendant further asserts that other courts have declined to conclude that the FHFA-C felt compelled to follow Treasury based on allegations that Treasury invented the amendment concept or led the process.

### a.  The court has jurisdiction over claims based on actions that resulted from government coercion.

The court has jurisdiction over claims premised on the FHFA-C's actions if Treasury's "influence over the" FHFA-C "was coercive rather than merely persuasive."  A & D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1154 (Fed. Cir. 2014).  The line between coercion and persuasion "is highly fact-specific."  Id.  Precedent from the United States Court of Appeals for the Federal Circuit ("Federal Circuit") frames the contours of the inquiry.  In Langenegger v. United States, the plaintiffs pleaded that the United States coerced El Salvador by threatening to withhold financial and military assistance unless El Salvador passed legislation expropriating private property.  756 F.2d 1565, 1567 (Fed. Cir. 1985).  The Federal Circuit disagreed with the plaintiffs' characterization of the threats because "[d]iplomatic persuasion among allies is a common occurrence, and as a matter of law, cannot be deemed sufficiently irresistible to warrant a finding of [coercion], however difficult refusal may be as a practical matter."  Id. at 1572.  Similarly, the Federal Circuit concluded in B & G Enterprises, Ltd. v. United States that California was not coerced into enacting restrictions on smoking, notwithstanding the federal government conditioning grants on states enacting such limits.  220 F.3d 1318, 1321, 1325 (Fed. Cir. 2000); see also A & D Auto, 748 F.3d at 1155 (explaining that "coercion was not established" in B & G).  The court explained that "it was California's decision to create [the] restrictions[;] . . . Congress may have provided the bait, but California decided to bite."  B & G, 220 F.3d at 1325.  In A & D Auto, the Federal Circuit addressed coercion in the context of the government allegedly conditioning vital financial assistance to bankrupt automobile companies on those companies terminating some of their franchise agreements.  748 F.3d at 1145.  Unable to resolve the issue due to gaps in the record, the court noted in dicta that a relevant consideration was "whether the government financing was essential to the companies."  Id.

A common thread runs through the Federal Circuit's decisions:  the importance of choice.  A nonfederal actor is not coerced when it can choose to go against the wishes of the United States, even if doing so will cause significant hardships, Langenegger, 756 F.2d at 1567, or result in a loss of prospective benefits, id.; B & G, 220 F.3d at 1325.  But there is no choice, in any

meaningful sense, when there is only one realistic option. A & D Auto, 748 F.3d at 1145 (noting the importance of considering whether the companies could survive without accepting the government's offer); cf. Nevada v. Skinner, 884 F.2d 445, 448 (9th Cir. 1989) (noting that, with respect to Congress's spending powers, "the federal government may not, at least in certain circumstances, condition the receipt of funds in such a way as to leave the state with no practical alternative but to comply with federal restrictions"). Put differently, the nonfederal actor must make a voluntary decision, which it cannot do if there is only one realistic option. See BMR Gold Corp. v. United States, 41 Fed. Cl. 277, 282 (1998) (finding that the "the necessary element of coerciveness" for a taking was missing because the plaintiff granted the military permission to cross his land); accord Henn v. Nat'l Geographic Soc., 819 F.2d 824, 826 (7th Cir. 1987) (noting that hard choices remain voluntary when they are not akin to "Don Corleone's '[m]ake him an offer he can't refuse'"). In sum, the FHFA-C was not coerced if it voluntarily chose to enter into the PSPA Amendments.

### b. Plaintiff has not established that Treasury coerced the FHFA-C into approving the PSPA Amendments.

In support of its contention that Treasury coerced the FHFA-C into approving the PSPA Amendments, plaintiff alleges that Treasury proposed the terms of the amendments and used its influence over the FHFA-C to ensure compliance with Treasury's wishes. Those allegations are not enough to establish coercion. First, given the Enterprises' improving financial condition and Treasury's existing funding commitment, the FHFA-C's decision to execute the PSPA Amendments was voluntary because it could reject the deals without imperiling the Enterprises. The facts here, therefore, are diametrically opposed to the circumstances in A & D Auto that the Federal Circuit suggested may support coercion because the automobile dealers faced insolvency if they did not accede to the financing terms. See 748 F.3d at 1145. Second, the FHFA-C's lack of protestation is informative. "[T]he very fact that FHFA[-C] itself [did] not br[ing] suit to enjoin the Treasury from the alleged coercion it was subjected to suggest[s] that FHFA[-C] was an independent, willing participant in its negotiations with the Treasury." Robinson v. Fed. Hous. Fin. Agency, 223 F. Supp. 659, 668 (E.D. Ky. 2016), aff'd, 876 F.3d 220 (6th Cir. 2017). The court's conclusion is bolstered by the fact that another court has held that materially similar allegations to those at issue here did not "come close to a reasonable inference that [the] FHFA[-C] considered itself bound to do whatever Treasury ordered." Perry Capital LLC v. Lew, 70 F. Supp. 3d 208, 226 (D.D.C. 2014) ("Perry I"), aff'd in part, rev'd in part sub nom. Perry II, 864 F.3d at 591. This court agrees with the reasoning in Perry I: the PSPA Amendments were executed by sophisticated parties, and many agreements arise from a party's proposal being accepted by the other party. Id. Plaintiff has not established that the FHFA-C was coerced into approving the PSPA Amendments by Treasury.

### 3. The FHFA-C is not Treasury's agent.

Plaintiff further argues that the FHFA-C's actions are attributable to the United States because the FHFA-C is Treasury's agent. Defendant counters that plaintiff has not pleaded an agency relationship because Treasury does not control the FHFA-C's operations. Indeed, defendant notes that Treasury is statutorily barred from exercising such control.

The United States is subject to claims in this court for the actions of a third party "if [that] party is acting as the government's agent . . . ." A & D Auto, 748 F.3d at 1154. "An essential element of agency is the principal's right to control the agent's actions." Hollingsworth v. Perry, 570 U.S. 693, 713 (2013) (quoting Restatement (Third) of Agency § 1.01 cmt. f (Am. Law. Inst. 2005)); accord O'Neill v. Dep't of Hous. & Urban Dev., 220 F.3d 1354, 1360 (Fed. Cir. 2000) (acknowledging that the common-law meaning of agency requires, among other things, that the principal has the right to control the agent's conduct); see also Preseault v. United States, 100 F.3d 1525, 1537 (Fed. Cir. 1996) (concluding that a state's actions were attributable to the United States when the state acted pursuant to the Interstate Commerce Commission's order); Hendler v. United States, 952 F.2d 1364, 1378-79 (Fed. Cir. 1991) (attributing a state's actions to the United States when the state acted under authority flowing from an Environmental Protection Agency order). The facts, as alleged, do not reflect that Treasury controlled the FHFA-C's actions because Congress explicitly precluded the FHFA-C from being subservient to another agency, 12 U.S.C. § 4617(a)(7) (providing that the FHFA-C cannot be subject to the "direction or supervision" of any other agency), and plaintiff has not alleged facts indicating that Treasury exercised such control notwithstanding the statutory bar. Although the FHFA-C was required by the PSPAs to obtain Treasury's approval for certain actions (e.g., issuing dividends), the PSPAs did not provide Treasury with the right to unilaterally order amendments. Moreover, plaintiff describes an FHFA-C that made decisions independently: Treasury sought to influence the opinions of the FHFA-C's senior officials; Treasury "push[ed]" for the PSPA Amendments; and the FHFA-C agreed to the PSPA Amendments. 1st Am. Compl. ¶¶ 2, 62, 64. Simply stated, plaintiff has not alleged facts establishing that Treasury exercised the control over the FHFA-C that is necessary for an agency relationship.

### 4. The FHFA-C is the United States because the FHFA-C retains the FHFA's governmental character.

In addition, plaintiff contends that the FHFA-C is itself a government actor.[14] Defendant disagrees. First, relying on O'Melveny & Myers v. Fed. Deposit Ins. Corp., 412 U.S. 79 (1994), defendant argues that the FHFA-C is not the United States because the FHFA-C stands in the Enterprises' shoes. Specifically, defendant asserts that Congress's decision to have the FHFA-C succeed to the Enterprises' rights reflects that Congress intended the FHFA-C step into the Enterprises' private shoes and shed its government character. Second, defendant argues that the FHFA-C's exercise of nontraditional conservatorship powers is immaterial because Congress can expand the conservator's role without transforming it into a government actor. Third, defendant argues that the Enterprises are not government instrumentalities—which means that the FHFA did not step into the shoes of a government actor when it became the Enterprises' conservator— because the government does not retain permanent authority to appoint the Enterprises' directors. Defendant contends that the government only has temporary, albeit indefinite, control over the Enterprises because the conservatorships are not permanent.

---

[14] To determine whether this action is against the United States, the court need not reach plaintiff's argument that Treasury and the FHFA-C formed a "control group." See Pls.' Corrected Combined Opp'n to Def.'s Omnibus Mot. to Dismiss 22-26.

In response, plaintiff disputes the premise of defendant's argument that, pursuant to O'Melveny, the FHFA becomes the Enterprises when acting as conservator.  Plaintiff asserts that O'Melveny does not concern whether an entity is the United States or, if the decision can be read as addressing that issue, is distinguishable because it concerns receivers or is limited to conservators exercising traditional conservator powers.  Second, plaintiff argues that the FHFA has not shed its government status, even if it has stepped into the Enterprises' shoes, when it acts as conservator.  Specifically, plaintiff asserts that the FHFA-C retains the FHFA's government status because (1) the FHFA-C has acted beyond the traditional conservator powers and (2) Congress expressed its intention for that result by precluding the conservator from being subject to the supervision of "any other agency."  12 U.S.C. § 4617 (emphasis added).  Third, plaintiff argues that its claims are against the United States, even if the FHFA-C steps into the shoes of the Enterprises, because the Enterprises are government instrumentalities.

In short, the parties disagree over the government status of the FHFA-C.  The FHFA is indisputably the United States, see id. § 4511(a) (establishing the FHFA as an "independent agency of the Federal Government"), and so the only question is whether the FHFA sheds that status when it acts as conservator.  In other jurisdictions, courts have held (with near unanimity) that the FHFA loses its government status pursuant to O'Melveny.  In O'Melveny, the United States Supreme Court ("Supreme Court") explained that the Federal Deposit Insurance Corporation ("FDIC") "steps into [the] shoes" of a private company when acting as receiver and sheds its government character because the FDIC "succeed[s] to . . . all rights, titles, powers, and privileges of the [entity in receivership] . . . ."  512 U.S. at 86 (quoting 12 U.S.C. § 1821(d)(2)(A)(i)); see also AG Route Seven P'ship v. United States, 57 Fed. Cl. 521, 534 (2003) (citing O'Melveny for the proposition that the FDIC as receiver is a "private party, and not the government per se" because it "is merely standing in the shoes . . . of the defunct thrift").  The courts drawing from O'Melveny have concluded that the FHFA steps into the shoes of the Enterprises and sheds its government character when acting as conservator because Congress provided that the FHFA-C exercises the same rights with respect to the Enterprises as Congress granted to the FDIC as receiver.  See, e.g., Herron v. Fannie Mae, 861 F.3d 160, 169 (D.C. Cir. 2017); cf. Ameristar Fin. Servicing Co. v. United States, 75 Fed. Cl. 807, 811 (2007) (concluding, with respect to the FDIC, that the step-into-the-shoes principle set forth in O'Melveny also applies in the conservator context).

### a.  The FHFA-C is not the United States if the FHFA steps into the Enterprises' shoes when acting as conservator.

Plaintiff initially contends that defendant's reliance on O'Melveny is erroneous because, assuming that O'Melveny applies, the FHFA-C is the United States even though it steps into the Enterprises' shoes.  Specifically, plaintiff asserts that the FHFA-C is the United States under the facts alleged because (1) the FHFA-C exercises nontraditional conservator powers, (2) Congress intended that the FHFA-C retain the FHFA's government status, and (3) the FHFA-C steps into the shoes of a government instrumentality.  The court addresses each assertion in turn.

First, the FHFA-C did not become a government actor by exercising powers beyond those traditionally afforded to a conservator.  As a threshold matter, plaintiff has not alleged facts reflecting that the FHFA-C used such powers; the execution of the PSPA Amendments was a

"quintessential conservatorship" function.  Perry II, 864 F.3d at 607.  More importantly,
however, plaintiff would not prevail even if the FHFA-C exercised nontraditional
conservatorship powers in agreeing to the PSPA Amendments.  When this argument was pressed
in other jurisdictions, it was rejected:

> It may well be true that FHFA's actions would not be allowed under traditional
> principles of corporate or conservatorship law, but it does not follow that those
> actions are therefore governmental.  Legislatures can expand conservatorship and
> similar powers without transforming conservators into agents of the
> government.  Cf. Pegram v. Herdrich, 530 U.S. 211, 225-26 (2000) (explaining
> that the Employee Retirement Income Security Act altered the common law of
> trusts to permit certain actions that would otherwise violate the trustee's fiduciary
> duties).

Bhatti v. Fed. Hous. Fin. Agency, 332 F. Supp. 3d 1206, 1226 (D. Minn. 2018) (footnote
omitted).  The court agrees with that reasoning, and plaintiff provides no authority that supports
a contrary result.  Although plaintiff states that the United States Court of Appeals for the
District of Columbia Circuit ("D.C. Circuit") decision in Waterview Management Co. v. FDIC,
105 F.3d 696 (D.C. Cir. 1997), supports its position, it is mistaken.  Waterview is not on point
because the D.C. Circuit did not hold that a conservator is per se the United States when acting
pursuant to a congressional grant of broad powers.  Rather, it held that, as a matter of statutory
interpretation, the existence of a receivership did not preempt a prereceivership contract.  Id. at
699-702.

Second, Congress's instruction that the FHFA-C is not subject to the supervision of any
other agency does not reflect congressional intent for the FHFA to retain its government status
when acting as conservator even if it steps into the shoes of the Enterprises.  Because the court
only reaches this issue by assuming that O'Melveny is instructive, the statutory language
concerning supervision of the FHFA-C does not support a finding of jurisdiction because the
same language is present in the statute that the Supreme Court addressed in O'Melveny.  See 512
U.S. at 85-86 (discussing 12 U.S.C. § 1821).  Compare 12 U.S.C. § 1821(c)(3)(C) ("When acting
as conservator or receiver . . . , [the FDIC] shall not be subject to the direction or supervision of
any other agency or department of the United States or any State in the exercise of the [FDIC's]
rights, powers, and privileges."), with id. § 4617(a)(7) ("When acting as conservator or receiver,
the [FHFA] shall not be subject to the direction or supervision of any other agency of the United
States or any State in the exercise of the rights, powers, and privileges of the [FHFA].").

The third argument advanced by plaintiff—that the FHFA-C is the United States because
it steps into the shoes of a government instrumentality—also is not meritorious.  A government
instrumentality's actions are attributable to the United States for purposes of the Tucker Act.  See
Corr v. Metro. Wash. Airports Auth., 702 F.3d 1334, 1336 (Fed. Cir. 2012) (noting that a claim
against a government instrumentality is a claim against the United States for purposes of the
Little Tucker Act, 28 U.S.C. § 1346(a)(2)).  The Supreme Court established in Lebron v.
National Railroad Passenger Corp. that a company is a government instrumentality when (1) it is
created by "special law," (2) it is established "for the furtherance of governmental objectives,"
and (3) the federal government "retains for itself permanent authority to appoint a majority of the

[company's] directors . . . ."  513 U.S. 374, 400 (1995).  After <u>Lebron</u>, the Supreme Court clarified that, for purposes of the instrumentality test, "the practical reality of federal control and supervision prevails over Congress' disclaimer of the [the entity's] governmental status."  <u>Dep't of Transp. v. Ass'n of Am. R.Rs.</u>, 135 S. Ct. 1225, 1233 (2015).

There is no dispute that the Enterprises satisfy the first two prongs of the <u>Lebron</u> test; Congress created the Enterprises by special law to achieve governmental objectives related to the housing market.  <u>See</u> 12 U.S.C. § 4501; <u>see also</u> <u>Herron</u>, 861 F.3d at 167 (addressing claims involving Fannie and noting that "[t]his case satisfies the first two <u>Lebron</u> criteria"); <u>Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp.</u>, 75 F.3d 1401, 1406-07 (9th Cir. 1996) (reaching same conclusion for Freddie).  The status of the Enterprises, therefore, turns on the third prong:  whether the government retains permanent authority to appoint a majority of the Enterprises' directors.

The Federal Circuit has not addressed the government-control prong with respect to the Enterprises, but courts in other jurisdictions have done so.  Those decisions provide a starting point for the court.  It appears that every court to consider the issue, with the exception of one district court, has held that the government does not exercise permanent control over the Enterprises.  <u>Sisti v. Fed. Hous. Fin. Agency</u>, 324 F. Supp. 3d 273, 279 (D.R.I. 2018) (concluding that the government retains permanent authority to control the Enterprises after noting that "[t]he non-controlling precedent to date" has reached the opposite conclusion).  Most of the courts that concluded that the government lacks permanent control over the Enterprises issued their decisions before the Supreme Court in <u>Association of American Railroads</u> emphasized the importance of evaluating the practical reality over nomenclature, and the other courts focused on the statutory purpose for the conservatorships rather than the Enterprises' actual situation.  <u>E.g.</u>, <u>Herron</u>, 861 F.3d at 169 (relying on the notion that a conservatorship is fundamentally temporary).  In other words, the courts adopting the prevailing view considered the issue of control without regard for the Supreme Court's instruction to focus on the practical reality.  The court, therefore, does not find those decisions persuasive.

The crux of the inquiry, as the Supreme Court mandates, is on the practical reality of the government's control over the Enterprises.  <u>Ass'n of Am. R.Rs.</u>, 135 S. Ct. at 1233.  It is of no import that Congress nominally authorized a facially temporary conservatorship, <u>see</u> 12 U.S.C. § 4617(a) (permitting the FHFA to act as conservator to "reorganiz[e]" or "rehabilitat[e]" the Enterprises), because Congress's disclaimers are no substitute for the court's obligation to assess the government's actual control, <u>Ass'n of Am. R.Rs.</u>, 135 S. Ct. at 1233.  The court focuses on the length of the conservatorship because the FHFA-C wields complete control over the Enterprises so long as they are in conservatorship.  <u>See generally</u> 12 U.S.C. § 4617.

Plaintiff alleges that the Enterprises will remain undercapitalized—and thus subject to conservatorship pursuant to 12 U.S.C. § 4617(a)(3)(J)—until the PSPAs, in their current form, are changed because the Enterprises cannot accumulate any capital under the existing terms of the PSPAs.  Although the PSPAs could be further amended, plaintiff's allegations reflect that Treasury and the FHFA-C will not do so because the purpose of the PSPA Amendments is to prevent the Enterprises from accumulating the necessary capital to become independent companies.  Plaintiff, in short, has alleged that the government intended, and has taken steps to

ensure, that the conservatorships never end. Those facts, viewed in isolation, would support a conclusion that the practical reality is that the Enterprises are under permanent government control. The court's inquiry, however, is not limited to plaintiff's allegations because it has taken judicial notice of relevant facts reflecting that the status quo has changed: the Treasury Secretary and the FHFA Director are now both committed to ending the conservatorships. Moreover, the idea that the Enterprises are permanently subject to government control because they can never accumulate the capital needed to exit the conservatorships is undermined by recent developments. Indeed, Treasury proposed amending the Net Worth Sweep to allow the Enterprises to retain more capital, and the FHFA Director testified during his confirmation hearing that, if confirmed, he would seek to increase the amount of capital that the Enterprises retain. Simply stated, the practical reality is that the Enterprises are not subject to permanent government control because the relevant parties are working to terminate the conservatorships.[15]

In sum, the FHFA-C does not become the United States if the FHFA steps into the Enterprises' shoes when serving as conservator.

### b. The FHFA-C retains the FHFA's government character because the FHFA-C does not step into the Enterprises' shoes.

The key inquiry, therefore, is whether the FHFA steps into the shoes of the Enterprises when acting as conservator. Defendant argues that the FHFA-C sheds its government character and assumes the identity of the Enterprises based on the reasoning in O'Melveny. Defendant's reliance on O'Melveny is misplaced. O'Melveny concerns a receiver stepping into the shoes of a failed bank. 512 U.S. at 86. The roles of a conservator and receiver are meaningfully different. In a recent decision, the United States District Court for the District of Rhode Island artfully explained the differences and their import for assessing whether the FHFA-C is the government:

> The O'Melveny Court held that FDIC, when acting as a receiver for a private entity, steps into the shoes of that private entity for state law claims. This holding makes sense given the purpose of receivership: "to preserve a company's assets, for the benefit of creditors, in the face of bankruptcy." When FDIC is appointed receiver, it must dispose of the received entity's assets, resolving obligations and claims made against the entity. Notably, "[i]n receivership, the receiver owes fiduciary duties to the creditors, which the corporation would otherwise owe to creditors during a period of insolvency." It logically follows, then, that the

---

[15] Plaintiff may disagree with the court's conclusion that events occurring after the PSPA Amendments are relevant to determining whether the Enterprises were under permanent government control during the events discussed in plaintiff's complaint. Even if the court agreed that events occurring after the PSPA Amendments are not germane, plaintiff still would not prevail because it alleges that the conservatorships began as temporary measures. See 1st Am. Compl. ¶ 7 (noting the temporary nature of the conservatorships and quoting an FHFA publication stating that the conservatorships would be terminated once the Enterprises had been restored "to a safe and solvent condition"); id. (noting that the FHFA reassured the market that the Enterprises would return to normal business operations). Thus, the Enterprises were not under permanent government control before the PSPA Amendments.

receiver steps into the shoes of the private entity, because it assumes the fiduciary duties of that entity.

Conservatorship, in contrast, serves a different function. FHFA has described the purpose of conservatorship is "to establish control and oversight of a company to put it in a sound and solvent condition." Conservators, unlike receivers, have a fiduciary duty running to the corporation itself.

This is "critically distinct" from the fiduciary duties owed as a receiver—the receiver does indeed "step into the shoes" of the entity by assuming the fiduciary duties <u>of</u> the entity, but the conservator does not: it remains distinct, and rather owes a duty <u>to</u> the entity. Given the difference in fiduciary duties, <u>O'Melveny</u>'s "steps into the shoes" holding makes sense in the context of receivership, but not in the context of conservatorship.

<u>Sisti</u>, 324 F. Supp. 3d at 282-83 (citations and footnotes omitted). <u>See generally</u> Brian Taylor Goldman, <u>The Indefinite Conservatorship of Fannie Mae and Freddie Mac Is State-Action</u>, 17 J. Bus. & Sec. L. 11, 23-30 (2016). The district court, relying on the above analysis, declined to treat the FHFA-C as a private actor. <u>Sisti</u>, 324 F. Supp. 3d at 284. This court agrees with the reasoning and conclusion in <u>Sisti</u>: the FHFA does not shed its government character when acting as conservator because it does not step into the shoes of the Enterprises. Otherwise stated, the FHFA-C is the United States because it retains the FHFA's government character. Plaintiff's claims, therefore, are against the United States for purposes of the Tucker Act.

**B. The court lacks jurisdiction over plaintiff's claim that sounds in tort.**

**1. Plaintiff's fiduciary duty claim sounds in tort.**

Defendant next argues that the court lacks jurisdiction over plaintiff's fiduciary duty claim because the United States does not owe to each Enterprise's shareholders a fiduciary duty that is grounded in a statute or contract. Defendant asserts that such a fiduciary duty cannot be based on (1) HERA because, pursuant to the statute, the FHFA-C is only required to act in the government's and the Enterprises' best interests; or (2) the PSPAs because plaintiff is not a party to those contracts. Plaintiff, in its opposition to defendant's motion to dismiss, counters that its claim is based on a fiduciary duty rooted in both HERA and the PSPAs. As to HERA, plaintiff asserts that Congress made the FHFA-C a fiduciary by authorizing it to control the Enterprises, entrusting it with duties that are at the core of what it means to be a fiduciary, and using terminology—"conservator"—associated with a fiduciary. With respect to the PSPAs, plaintiff argues that Treasury owes a fiduciary duty to the shareholders because it, acting with the FHFA-C, acquired control rights under the contract.

The court, pursuant to the Tucker Act, lacks jurisdiction over tort claims. 28 U.S.C. § 1491(a)(1). A breach of fiduciary duty is generally classified as a tort. <u>Newby v. United States</u>, 57 Fed. Cl. 382, 294 (2003). A fiduciary duty claim, however, does not sound in tort for purposes of the Tucker Act when the fiduciary relationship is founded on a money-mandating statute or a contractual provision between the claimant and United States. <u>See Hopi Tribe v.</u>

United States, 782 F.3d 662, 667 (Fed. Cir. 2015) (statute); Cleveland Chair Co. v. United States, 557 F.2d 244, 246 (Ct. Cl. 1977) (contract); see also 28 U.S.C. § 1491(a)(1) (providing jurisdiction over claims "founded upon . . . any Act of Congress . . . or contract with the United States").

The initial issue is whether HERA establishes a fiduciary relationship between the FHFA-C and the Enterprises' shareholders. The court begins with the language of the statute. Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999). "If Congress has expressed its intention by clear statutory language, that intention controls and must be given effect." Rosete v. Office of Pers. Mgmt., 48 F.3d 514, 517 (Fed. Cir. 1995); accord Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Congress provided in HERA that the FHFA-C is only required to act in the interests of itself or the Enterprises. 12 U.S.C. § 4617(b)(2)(J). That statement reflects a clear intent: the FHFA-C does not owe a fiduciary duty to shareholders because the conservator is not required to consider shareholders' interests.[16] See id.; see also Collins v. Mnuchin, 938 F.3d 553, 580 (5th Cir. 2019) (en banc) (noting that HERA "may permit" the FHFA-C to pursue actions that are "inconsistent with fiduciary duties"), petitions for cert. filed, 88 U.S.L.W. 3114 (U.S. Sept. 25, 2019) (No. 19-422), 88 U.S.L.W. 3146 (U.S. Oct. 25, 2019) (No. 19-563). The plain language controls, and therefore the court does not consider the peripheral considerations urged by plaintiff such as the implications of the word "conservator," the FHFA-C's control over the Enterprises, or the FHFA-C's other powers. In sum, plaintiff cannot establish jurisdiction for its fiduciary duty claim by relying on HERA.

Next, the court turns to whether Treasury, acting together with the FHFA-C, owed a fiduciary duty to the Enterprises' other shareholders because it acquired control rights by agreeing to the PSPAs. Plaintiff's argument is premised on the state-law principle (which it terms "general corporate law") that a controlling shareholder owes a fiduciary duty to the minority shareholders. The court is not convinced. First, plaintiff's allegation of a fiduciary relationship is not founded on a contract within the meaning of the Tucker Act. Plaintiff is not attempting to enforce any duty imposed on Treasury that is specified in the PSPAs. It invokes the contracts solely to establish that Treasury, with the assistance of the FHFA-C, is a controlling shareholder and relies on that conclusion to argue that Treasury has a fiduciary duty based on state law. The contract, otherwise stated, is one step removed from the purported genesis of the fiduciary duty—the application of state-law principles. That gap is too much in light of the court's obligation to narrowly construe the Tucker Act's waiver of sovereign immunity. See

---

[16] The court's interpretation of HERA's plain language is buttressed by the fact that Congress seemingly made a deliberate decision to exclude shareholder interests from the FHFA-C's considerations. Congress modeled HERA on the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"). Jacobs v. Fed. Hous. Fin. Agency, 908 F.3d 884, 893 (3d Cir. 2018). Under FIRREA, Congress permitted the FDIC as conservator to consider the best interests of a bank, its depositors, or the FDIC. 12 U.S.C. § 1821(d)(2)(J)(ii). Although Congress permitted the FDIC to take into consideration the interests of its depositors, Congress omitted the analogue of depositors—shareholders—from the list of germane interests that the conservator can consider when acting pursuant to HERA. Compare id. (FIRREA), with 12 U.S.C. § 4617(b)(2)(J) (HERA). The omission is telling.

Smith, 855 F.2d at 1552 (noting that the Tucker Act is narrowly construed); see also Perry II, 864 F.3d at 619-20 (rejecting the legal theory that the Enterprises' shareholders' need to reference the PSPAs for their fiduciary duty claim was enough to conclude that the claim was rooted in a contract for purposes of the Tucker Act).

Second, plaintiff fails to demonstrate the applicability of the state-law principles underlying its theory for why Treasury assumed fiduciary duties. Federal law governs the obligations Treasury incurred by entering into the PSPAs. See Boyle v. United Techs. Corp., 487 U.S. 500, 519 (1988) ("The proposition that federal common law continues to govern the 'obligations to and rights of the United States under its contracts' is nearly as old as Erie [v. Tompkins, 304 U.S. 64 (1938),] itself."). Although courts may shape federal law by drawing from state-law principles, plaintiff does not explain why doing so is appropriate in this instance.

Third, plaintiff does not prevail even if its fiduciary duty claim could be founded on a contract and federal common law incorporates the state-law principles regarding controlling shareholders' fiduciary obligations. Under Delaware and Virginia law, a controlling shareholder owes a fiduciary duty to the minority shareholders. See Ivanhoe Partners v. Newmont Min. Corp., 535 A.2d 1334, 1344 (Del. 1987); Parsch v. Massey, 79 Va. Cir. 446 (2009); see also Quadrant Structured Prod. Co. v. Vertin, 102 A.3d 155, 183 (Del. Ch. 2014) (acknowledging that those "who effectively control a corporation" owe a fiduciary duty to others).[17]  To have the requisite level of control, the controlling shareholder must (1) be able to exercise a majority of the corporation's voting power or (2) direct the corporation without owning a majority of stock. Kahn v. Lynch Commc'n Sys., 638 A.2d 1110, 1113 (Del. 1994). The latter, effective exercise of control, "is not an easy test to satisfy"; the individual or group must be, "as a practical matter, . . . no differently situated than if they had majority voting control." In re PNB Holding Co. S'holders Litig., No. CIV.A. 28-N, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).

Plaintiff has not established that Treasury meets either control test. First, plaintiff does not allege that Treasury owns any of the Enterprises' voting stock. Treasury purchased preferred stock and acquired the right to buy common (i.e., voting) stock, but there is no indication that Treasury exercised its warrants or otherwise acquired common stock.[18]  Second, plaintiff does not demonstrate that Treasury exercised effective control over the Enterprises or was, in plaintiff's terms, a "dominant shareholder." Pls.' Corrected Combined Opp'n to Def.'s Omnibus Mot. to Dismiss 29 (quoting Sisti, 324 F. Supp. 3d at 283 n.9). Although Treasury acquired the

---

[17]  The court refers to Delaware and Virginia law because Fannie is a Delaware corporation, and Freddie is a Virginia corporation. When evaluating Virginia law, the court also looks to Delaware state court decisions because Virginia courts do so to resolve unsettled issues in the Commonwealth. E.g., U.S. Inspect Inc. v. McGreevy, No. 160966, 2000 WL 33232337, at *4 (Va. Cir. Ct. Nov. 27, 2000).

[18]  Even if Treasury had exercised its option to buy a majority of the voting stock, it would not be a controlling shareholder because the FHFA-C succeeded to all of the shareholders' rights. See 12 U.S.C. § 4617(b)(2)(A) (noting that the FHFA-C, by operation of law, succeeds to all rights and powers of any Enterprise shareholder). Treasury, therefore, would have no voting power.

right to preclude the Enterprises from taking certain actions, Treasury did not control the Enterprises because it could not direct any action—it could only respond to certain requests made by the Enterprises.  As a practical matter, therefore, Treasury is situated differently than if it had majority voting power.

Having rejected the contentions advanced by plaintiff in its opposition brief, the court turns to an argument that appears for the first time in plaintiff's supplemental brief, which was filed at the court's request after the initial round of briefing on defendant's omnibus motion to dismiss was complete, Fairholme II was decided, and the court held a status conference regarding further proceedings in the related cases.[19]  In its supplemental brief, plaintiff contends that its fiduciary duty claim was founded on a contention that Treasury and the FHFA-C acted as a "control group," that this contention was set forth in its opposition brief in the section addressing the court's jurisdiction over its fiduciary duty claim, and that the court did not, in Fairholme II, consider this contention.  But no such contention was made in plaintiff's opposition brief.

In its opposition brief, plaintiff explained that under state law, multiple shareholders who are legally connected can form a "control group" and be "deemed a single, majority shareholder," and then asserted that Treasury and the FHFA-C were such a control group, acting in concert as the United States.  See Pls.' Corrected Combined Opp'n to Def.'s Omnibus Mot. to Dismiss 22-26.  In other words, plaintiff advanced its control group contention solely to establish that its suit was against the United States.  In the portion of its opposition devoted to countering defendant's jurisdictional attack on its fiduciary duty claim, plaintiff asserted only two bases for a fiduciary duty; each one was treated separately as governing the conduct of either Treasury or the FHFA-C.  It did not argue that the fiduciary duty arose from Treasury and the FHFA-C acting as a control group.  Accordingly, the court did not consider plaintiff's control group allegation as a foundation for any fiduciary duty claim in Fairholme II, among the arguments raised by the plaintiffs in these related cases.

Because plaintiff's control group contention was not raised in its opposition brief in support of its fiduciary duty claim, it is waived.  See United States v. Ford Motor Co., 463 F.3d 1267, 1277 (Fed. Cir. 2006) (explaining that "[a]rguments raised for the first time in a reply brief are not properly before this court"); Ironclad/EEI v. United States, 78 Fed. Cl. 351, 358 (2007) (noting that "under the law of this circuit, arguments not presented in a party's principal brief to the court are typically deemed to have been waived").  But even if plaintiff's argument were not waived, it is not persuasive.  In Fairholme II, the court explained why neither Treasury nor the FHFA-C owed a fiduciary duty to the shareholders of Fannie and Freddie.  147 Fed. Cl. at 37-40.  The court is not persuaded that a control group composed of two entities, neither of which was bound by the fiduciary duty posited by plaintiff, would be bound by a fiduciary duty simply because the entities are alleged to have worked in concert against the interests of the other shareholders of the Enterprises.  Plaintiff's attempt to graft a state law concept of a control group of shareholders onto a Tucker Act jurisdictional inquiry is not anchored in binding or even

---

[19]  As defendant notes, the court did not invite plaintiff, after the status conference held March 5, 2020, to relitigate issues already decided in Fairholme II.

persuasive precedent, as explained in <u>Fairholme II</u>.  <u>Id.</u> at 39-40.  Having considered the allegations in plaintiff's amended complaint, the timely arguments set forth in plaintiff's opposition brief, and the untimely argument raised in plaintiff's supplemental brief, the court concludes that it lacks jurisdiction over plaintiff's fiduciary duty claim because it sounds in tort. Therefore, it dismisses count III of plaintiff's amended complaint.

### 2.  Plaintiff's takings and illegal-exaction claims do not sound in tort.

Defendant also argues that plaintiff's Fifth Amendment takings and illegal-exaction claims sound in tort because they are premised on purported misconduct by the FHFA-C. Plaintiff counters that it has pleaded the predicates for takings and illegal-exaction claims, which means that it is irrelevant whether it also alleged facts that are germane to tortious actions.

When a party pleads the predicates for a takings claim or illegal-exaction claim, the court possesses jurisdiction to entertain such claims.  See <u>Hansen v. United States</u>, 65 Fed. Cl. 76, 80-81 (2005) ("[S]o long as there is some material evidence in the record that establishes the predicates for a [claim covered by the Tucker Act,] . . . a plaintiff succeeds in demonstrating subject matter jurisdiction in this court . . . .").  Those claims, at a basic level, are contentions that the government expropriated private property lawfully (takings) or unlawfully (illegal exaction).  See <u>Orient Overseas Container Line (UK) Ltd. v. United States</u>, 48 Fed. Cl. 284, 289 (2000) ("Takings claims arise because of a deprivation of property that is authorized by law. Illegal exactions arise when the government requires payment in violation of the Constitution, a statute, or a regulation." (citing <u>Dureiko v. United States</u>, 209 F.3d 1345, 1359 (Fed. Cir. 2000); <u>Eastport S.S. Corp. v. United States</u>, 372 F.2d 1002, 1007-08 (Ct. Cl. 1967))).  If a party alleges the necessary predicates for these claims, the court is not deprived of jurisdiction even if the complaint contains allegations that could support a tort claim.  See <u>El-Shifa Pharm. Indus. Co. v. United States</u>, 378 F.3d 1346, 1353 (Fed. Cir. 2004) ("That the complaint suggests the United States may have acted tortiously towards the appellants does not remove it from the jurisdiction of the Court of Federal Claims."); <u>Rith Energy, Inc. v. United States</u>, 247 F.3d 1355, 1365 (Fed. Cir. 2001) (explaining that this court has jurisdiction over a takings claim "even if the government's action was subject to legal challenge on some other ground").  Here, plaintiff pleads the predicates for takings and illegal-exaction claims by alleging, in essence, that it was forced to give its property to the government because of lawful or unlawful government conduct. Therefore, it is of no import to the court's jurisdiction whether plaintiff has alleged facts that would also support a tort claim.

### C.  The court lacks jurisdiction over plaintiff's implied-in-fact-contract claim because plaintiff is not a third-party beneficiary of such a contract.

Defendant argues next that the court lacks jurisdiction to entertain plaintiff's implied-in-fact-contract claim because plaintiff is not a third-party beneficiary of such a contract. Specifically, defendant asserts that plaintiff has not established that it is an intended beneficiary independent of its status as a shareholder and that any benefit that is related to its status as a shareholder is insufficient for jurisdiction.  Plaintiff counters that it is an intended third-party beneficiary of implied contracts, between the FHFA and each Enterprise's board, in which the boards consented to the conservatorships in exchange for the FHFA-C operating the Enterprises

as a fiduciary and returning them to sound condition.  Specifically, plaintiff asserts that the intent to benefit the shareholders is evident from (1) the boards' consent to the conservatorships because shareholders would benefit from a conservator focused on returning the Enterprises to a better condition, and (2) the government acknowledging that the Enterprises' stock would remain outstanding while the Enterprises were in conservatorship.

The court's jurisdiction over contract claims is limited by the Tucker Act.  Ransom v. United States, 900 F.2d 242, 244 (Fed. Cir. 1990).  Of particular import here, ordinarily, a plaintiff must be in privity of contract with the United States to invoke this court's jurisdiction over a contract claim against the government.  Fid. & Guar. Ins. Underwriters, Inc. v. United States, 805 F.3d 1082, 1087 (Fed. Cir. 2015).  But privity is not required if "the plaintiff can demonstrate that it was an intended third-party beneficiary under the contract."  Pac. Gas & Elec. Co. v. United States, 838 F.3d 1341, 1361 (Fed. Cir. 2016).

"Third party beneficiary status is an 'exceptional privilege.'"  Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001) (quoting German All. Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230 (1912)).  The conditions for attaining such status are "stringent."  Anderson v. United States, 344 F.3d 1343, 1352 (Fed. Cir. 2003).  "[S]hareholders seeking status to sue as third-party beneficiaries of an allegedly breached contract must 'demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly.'"  Castle v. United States, 301 F.3d 1328, 1338 (Fed. Cir. 2002) (quoting Glass, 258 F.3d at 1354).  Specifically, "the contract must express the intent of the promissor to benefit the shareholder personally, independently of his or her status as shareholder."  Glass, 258 F.3d at 1353-54.  As a practical matter, the shareholder does not personally benefit independent of its status as a shareholder when the contractual promises pertain only to the treatment of the company.  See FDIC v. United States, 342 F.3d 1313, 1320 (Fed. Cir. 2003) (noting that the broken promises concerned the treatment of the company such that the plaintiffs did not benefit independent of their status as shareholders); accord Maher v. United States, 314 F.3d 600, 605 (Fed. Cir. 2002) (concluding that the plaintiffs were not third-party beneficiaries when they failed to "establish[] that the government took on any obligations in the merger agreement for [the plaintiffs'] personal benefit, or even that the merger agreement contains any provisions pertaining to [the plaintiffs] personally").

As plaintiff is not a party to the alleged implied contracts between the FHFA and the Enterprises, the relevant issue is whether plaintiff is a third-party beneficiary of those agreements.  It is not.  First, it is of no import that the Enterprises, as plaintiff argues, purportedly agreed to the conservatorships because that would serve the interests of shareholders.  Indeed, "every action of a corporation is supposed to benefit its shareholders," but the "law has not viewed this general benefit as making every shareholder a third-party beneficiary."  Suess v. United States, 33 Fed. Cl. 89, 94 (1995).  Second, plaintiff's allegations reflect that it only benefits from the alleged implied contracts by virtue of its shareholder status.  The relevant promises concerned how the FHFA-C would operate the Enterprises; the crux of the purported agreements was the FHFA-C promising to operate the Enterprises as a fiduciary to preserve their assets and return them to sound condition.  Because the promises in the alleged implied contracts were directed at the Enterprises, plaintiff cannot be a third-party beneficiary of the alleged contract.  See FDIC, 342 F.3d at 1320.  Third, plaintiff has not demonstrated that the FHFA

intended that plaintiff would benefit independently of its status as a shareholder even if it did so benefit. Plaintiff relies on the FHFA's statements that private stock would remain outstanding and shareholders would continue to hold an economic interest in their stock. Those factual statements, however, do not reflect that the FHFA intended to confer any specific benefit on plaintiff independent of its role as a shareholder. Because plaintiff has not alleged facts reflecting that the FHFA intended to confer a personal benefit on it, it is not a third-party beneficiary. See Glass, 258 F.3d at 1353-54. In sum, the court lacks jurisdiction to entertain plaintiff's implied-in-fact-contract claim because plaintiff is neither a party to a contract with the government nor a third-party beneficiary of any such agreement. Therefore, the court dismisses count IV of its amended complaint.

## V. STANDING

In addition to asserting that the court lacks subject-matter jurisdiction to entertain plaintiff's claims, defendant challenges plaintiff's standing to pursue its claims. A plaintiff bears the burden of demonstrating that it has standing for each claim. Starr Int'l Co. v. United States, 856 F.3d 953, 964 (Fed. Cir. 2017). It must establish, among other things, that it is "assert[ing its] own legal rights and interests, and cannot rest [its] claim[s] to relief on the legal rights or interests of third parties." Kowalski v. Tesmer, 543 U.S. 125, 129 (2004). Further, the label assigned to a claim is irrelevant; it is the substance of the allegations that controls. See Allen v. Wright, 468 U.S. 737, 752 (1984) ("[T]he standing inquiry requires careful examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claim asserted."), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014). Thus, in a suit brought by a shareholder, it is the substance of the allegations and not the label assigned to the allegations—i.e., direct or derivative—that matters. See Starr, 856 F.3d at 966-67; see also In re Sunrise Sec. Litig., 916 F.2d 874, 882 (3d Cir. 1990) ("Whether a claim is [direct] or derivative is determined from the body of the complaint rather than from the label employed by the parties."). A shareholder lacks standing to litigate nominally direct claims that are substantively derivative in nature because its personal request for relief would be based on the rights of the company. See Starr, 856 F.3d at 966-67; see also Weir v. Stagg, No. 09-21745-CIV, 2011 WL 13174531, at *9 (S.D. Fla. Feb. 7, 2011) ("Shareholders do not have standing to bring a direct action for injuries suffered by a corporation, but rather, must bring a derivative action."). A shareholder, therefore, must establish that the claims it labeled as direct are substantively direct in nature—i.e., premised on its injuries rather than the corporation's injuries—to have standing to litigate those claims. See Starr, 856 F.3d at 966-67.

Defendant argues that plaintiff lacks standing because its claims, pled as direct claims, actually belong to the Enterprises and are therefore derivative in nature. The parties in this case and the related cases fully briefed and argued this issue prior to the court issuing the Fairholme II decision. The court concluded in Fairholme II that Fannie and Freddie shareholders lack standing to pursue direct claims that are derivative in nature. Thereafter, the court solicited short supplemental briefs from plaintiff and defendant regarding the applicability of the holdings in Fairholme II to this case. In its supplemental brief, plaintiff suggests that its allegations are materially different from those asserted in Fairholme for purposes of standing, while defendant

contends in its supplemental brief that there are no material differences. All of the parties'
arguments are addressed below.

### A. Plaintiffs' allegations are not materially different from the allegations in <u>Fairholme</u>.

As an initial matter, plaintiff contends that its allegations are materially different from
those advanced in <u>Fairholme</u> in two respects, such that the standing inquiry would be affected.
Plaintiff first argues that the type of harm it has suffered and the type of relief it has requested
distinguish its claims from the direct claims in <u>Fairholme</u>. In essence, plaintiff attempts to
distinguish what it characterizes as the <u>Fairholme</u> plaintiffs' allegation of the expropriation of the
Enterprises' assets from its allegation of the expropriation of its economic interests. As
defendant points out, however, the direct claims in <u>Fairholme</u> and the claims in this case are
virtually indistinguishable in nature. All four counts of the amended complaint in this case
mirror, in every essential way, the direct takings, illegal-exaction, fiduciary duty, and breach-of-
implied-contract claims in <u>Fairholme</u>. Expropriation of the shareholders' economic interests was
alleged in <u>Fairholme</u>, just as it is alleged in the first amended complaint in this case. <u>Compare</u>
<u>Fairholme II</u>, 147 Fed. Cl. at 20, 46-47, <u>with</u> 1st Am. Compl. ¶¶ 88, 105-107. Thus, the standing
analysis in <u>Fairholme II</u> is fully applicable to the claims presented here.

Plaintiff next invokes its reliance on the allegation of the existence of a "control group,"
formed by Treasury and the FHFA-C, that dominated the Enterprises and injured it. In its view,
this factual distinction in its first amended complaint is significant because it was not discussed
in <u>Fairholme II</u>. Plaintiff fails to explain, however, how this factual distinction gives it standing
to bring its direct claims. Plaintiff apparently infers a logical connection between a control group
of shareholders and a controlling shareholder, but the connection is not explained in a way that is
helpful to the court. Indeed, in its supplemental brief plaintiff cites primarily to a section of its
opposition brief that does not address the topic of standing at all. If plaintiff wished to advance a
standing argument that specifically relied on the state law concept of a control group of
shareholders and cases discussing such a phenomenon, no such argument was made in its
opposition brief. Thus, any such standing argument that plaintiff may be attempting to make in
its supplemental brief, to the extent that one could be discerned, is waived as untimely.[20] <u>See</u>
<u>Ironclad/EEI</u>, 78 Fed. Cl. at 358.

### B. Plaintiff's claims actually belong to the Enterprises.

Having determined that plaintiff's allegations do not differ materially from those
advanced in <u>Fairholme</u>, the court turns to defendant's contention that plaintiff lacks standing to
litigate its claims. Defendant's standing argument is premised on its assertion that plaintiff's
claims actually belong to the Enterprises—and are therefore derivative in nature—because, to
prevail, plaintiff would need to establish an injury to the Enterprises and any relief would accrue

---

[20] Even if this argument were not waived, the court agrees with defendant that the
control group scenario alleged by plaintiff also fails to satisfy the criteria for dual-natured claims
that might provide standing to a shareholder plaintiff asserting direct claims. <u>See</u> Section V.B,
<u>infra</u> (discussing the criteria for dual-natured claims).

to the Enterprises. Plaintiff counters that it asserts direct claims because the government (1) targeted private shareholders and (2) discriminated against them by rearranging the Enterprises' capital structure to plaintiff's detriment, which renders the claims for such conduct both direct and derivative under the dual-nature exception.[21] Defendant replies that the Federal Circuit rejected the notion that a plaintiff states a direct claim by alleging it was targeted by the challenged action. Defendant also contends that the dual-nature exception is not applicable because Treasury was not a controlling shareholder, the Enterprises did not issue new shares, and the PSPA Amendments did not involve the reallocation of power.

Neither theory plaintiff advances for why its claims are substantively direct, rather than derivative, is persuasive. First, it is of no import whether the government targeted shareholders with the PSPA Amendments. See Starr, 856 F.3d at 973 (noting that the plaintiffs did not "sufficiently explain why the Government's subjective motivations are relevant to the inquiry into direct standing"). The direct-versus-derivative inquiry "turns on the plaintiff's injury, not the defendant's motive." Pagan v. Calderon, 448 F.3d 16, 30 (1st Cir. 2006). Second, plaintiff has not asserted claims that qualify as both direct and derivative based on the dual-nature exception. The Federal Circuit explained that, pursuant to this exception, shareholder claims may be both direct and derivative "when a 'reduction in [the] economic value and voting power affected the minority stockholders uniquely . . . .'" Starr, 856 F.3d at 968 (quoting Gentile v. Rossette, 906 A.2d 91, 99 (Del. 2006)). Specifically, shareholder claims are both direct and derivative if

> "(1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value," and "(2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders."

Id. (quoting Gentile, 906 A.2d at 100). The exception does not apply here because Treasury was not a controlling shareholder at the time the PSPA Amendments were executed,[22] the PSPA Amendments did not involve the issuance of new shares, and shareholder voting power was not reallocated under the PSPA Amendments. It is not enough, contrary to plaintiff's contention, that the government allegedly exacted economic value from the other shareholders by rearranging the corporate structure. See El Paso Pipeline GP Co. v. Brinckerhoff, 152 A.3d 1248, 1264 (Del. 2016) (applying Gentile and holding a plaintiff does not state a direct claim under the dual-nature exception by pleading the "extraction of solely economic value from the

---

[21] The plaintiffs in the related cases also asserted that their claims must be construed as direct claims to vindicate important federal policies if shareholders cannot assert derivative claims because of HERA. But as this court held in Fairholme II, the shareholders of the Enterprises, notwithstanding HERA, have standing to assert derivative claims because of the FHFA-C's conflict of interest. 147 Fed. Cl. at 49-51.

[22] Treasury is not a controlling shareholder for the reasons set forth in Section IV.B.1, supra.

minority by a controlling stockholder"). Because plaintiff has not established that its claims are substantively direct in nature, it cannot demonstrate that it has standing to litigate those claims.

Plaintiff fares no better if the court moves beyond its arguments for why its claims are substantively direct in nature. Federal law governs whether plaintiff's claims are direct or derivative. See Starr, 856 F.3d at 965. But, as the parties acknowledge, federal law in this area is informed by Delaware law. Id.; see also Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 97 (1991) (noting the "presumption that state law should be incorporated into federal common law"). Under Delaware law, the test for whether a shareholder's claim is derivative or direct depends on the answers to two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004) (en banc). "Normally, claims of corporate overpayment are . . . regarded as derivative [because] . . . the corporation is both the party that suffers the injury (a reduction in its assets or their value) as well as the party to whom the remedy (a restoration of the improperly reduced value) would flow." Gentile, 906 A.2d at 99, discussed in Starr, 856 F.3d at 965. Such claims are derivative even "though the overpayment may diminish the value of the corporation's stock or deplete corporate assets that might otherwise be used to benefit the stockholders, such as through a dividend." Protas v. Cavanagh, No. CIV.A. 6555-VCG, 2012 WL 1580969, at *6 (Del. Ch. May 4, 2012); see also Hometown Fin. Inc. v. United States, 56 Fed. Cl. 477, 486 (2003) ("[C]ourts have consistently held that shareholders lack standing to bring cases on their own behalf where their losses from the alleged injury to the corporation amount to nothing more than a diminution in stock value or a loss of dividends.").

Plaintiff focuses on the expropriation of the Enterprises' assets via compulsory payments of all profits. The gravamen of each claim is the same: The government, via the PSPA Amendments, compelled the Enterprises to overpay Treasury. Regardless of plaintiff's label (direct) or theory (taking, illegal exaction, breach of fiduciary duty, or breach of implied contract) for its claims, the claims are substantively derivative in nature because they are premised on allegations of overpayment.[23] See Gentile, 906 A.2d at 99; see also Roberts, 889 F.3d at 409 (explaining that the plaintiffs asserted "classic derivative claims" when they alleged that "the [PSPA Amendments] illegally dissipated corporate assets by transferring them to

---

[23] Plaintiff would remain unsuccessful if its allegations of waste and mismanagement (styled as self dealing, overreach, or abuse of discretion) were construed to be indicative of some action other than overpayment. Any claims premised on waste and mismanagement are derivative in nature. Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 353 (Del. 1988) (noting that "mismanagement resulting in corporate waste, if proven represents a direct wrong to the corporation . . . [that] is entirely derivative in nature"). Plaintiff's claims are also derivative in nature to the extent that they are premised on (1) a purported reduction in share price as a consequence of the Enterprises losing assets or (2) the FHFA-C acting unfairly by agreeing to transfer profits pursuant to the PSPA Amendments. See Hometown, 56 Fed. Cl. at 486 (stock prices); In re Straight Path Commc'ns Inc. Consol. S'holder Litig., No. CV 2017-0486-SG, 2017 WL 5565264, at *4 (Del. Ch. Nov. 20, 2017) ("Sale of corporate assets to a controller for an unfair price states perhaps the quintessential derivative claim . . . .").

Treasury").  Plaintiff cannot transform its substantively derivative claims into direct claims by merely alleging that, as a result of overpayments, it was deprived of its stockholder rights to receive dividends or liquidation payments.  The claims remain derivative because plaintiff's purported "harms are 'merely the unavoidable result . . . of the reduction in the value of the entire corporate entity.'"  Protas, 2012 WL 1580969, at *6 (quoting Gentile, 906 A.2d at 99); see also Agostino v. Hicks, 845 A.2d 1110, 1122 (Del. Ch. 2004) ("[T]he inquiry should focus on whether an injury is suffered by the shareholder that is not dependent on a prior injury to the corporation.").  Because plaintiff's claims are derivative in nature, plaintiff lacks standing to pursue those claims on its own behalf.

### C.  Plaintiff's claims are direct claims, as pled, and cannot be deemed to be derivative claims.

Plaintiff, while acknowledging that it asserts only direct claims,[24] attempts to avoid a dismissal of those claims for lack of standing by contending that "[e]ven if [its] direct claims were deemed derivative, [it] still may assert them, under circuit precedent, because the [FHFA-C] as conservator has a manifest conflict of interest."  Pls.' Corrected Combined Opp'n to Def.'s Omnibus Mot. to Dismiss 39.  The precedent upon which plaintiff relies is the Federal Circuit's decision in First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279 (Fed. Cir. 1999).

Once defendant challenged the standing of plaintiffs in these related cases to bring direct claims, the opposition brief filed in this case raised a novel standing argument.  Although plaintiff continues to argue that its claims are direct, and that it has standing to bring direct claims, it posits that "[e]ven if plaintiffs' direct claims [in these five cases] were deemed derivative, they still may assert them, under circuit precedent, because the [FHFA-C] as conservator has a manifest conflict of interest."  Pls.' Corrected Combined Opp'n to Def.'s Omnibus Mot. to Dismiss 39.  The precedent upon which plaintiff relies is the Federal Circuit's decision in First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279 (Fed. Cir. 1999).

In First Hartford, the Federal Circuit held that a shareholder of a company could bring a derivative claim, notwithstanding a succession clause, if the company was controlled by an entity with a conflict of interest.  Id. at 1283; accord id. at 1295 (remarking that the purpose of derivative suits was to "permit shareholders to file suit on behalf of a corporation when the managers or directors of the corporation, perhaps due to a conflict of interest, are unable or unwilling to do so, despite it being in the best interests of the corporation").  The court in

---

[24]  Indeed, there is no dispute that the four claims plaintiff asserts in its amended complaint are direct claims.  In each count plaintiff emphasizes that the harm to plaintiff is direct.  1st Am. Compl. ¶¶ 108, 112, 118, 134.  In addition, the relief requested by plaintiff is for monetary relief payable to it, not to the Enterprises.  Id. at 46; see also Pls.' Suppl. Br. on Outstanding Mot. to Dismiss 3-4 (arguing that payments to the Enterprises would be of no use to plaintiff).  Finally, the amended complaint contains a statement that plaintiff's claims are direct in nature.  See 1st Am. Compl. ¶ 102 ("[A]ny claim raised by CSS that might be considered derivative on behalf of the Company is in fact direct, on behalf of CSS itself.").

Fairholme II concluded that pursuant to First Hartford, the plaintiff who asserted derivative claims in Fairholme had standing to litigate those claims due to the FHFA-C's conflict of interest.  147 Fed. Cl. at 49-51.

If plaintiff had asserted derivative claims in its amended complaint, the "conflict of interest" holding in First Hartford would have aided plaintiff in its quest to establish standing.  But it did not do so.  Thus, its reliance on this holding in First Hartford is misplaced.

As for plaintiff's suggestion that its direct claims could be deemed derivative, it identifies no authority for that recharacterization of its claims, even though it had the opportunity to do so in its opposition brief and its supplemental brief.  The court finds plaintiff's "direct claims deemed derivative" argument, Pls.' Suppl. Br. on Outstanding Mot. to Dismiss 5 (emphasis removed), to be unsupported by authority and unpersuasive for the purpose of establishing plaintiff's standing to bring the claims in its amended complaint.[25]

### D.  Plaintiff's standing to bring direct claims is not established by another holding in First Hartford.

Finally, the court addresses an assertion in plaintiff's opposition brief that was not explicitly addressed in Fairholme II.  Only one sentence of that sixty-page brief was devoted to the following contention included among plaintiff's standing arguments:  "[T]he Federal Circuit has repeatedly recognized a direct claim where a shareholder alleged deprivation of a contingent property interest in a bank."  Pls.' Corrected Combined Opp'n to Def.'s Omnibus Mot. to Dismiss 38 (citing First Hartford, 194 F.3d at 1296; Cal. Hous. Sec., Inc. v. United States, 959 F.2d 955, 957 n.2 (Fed. Cir. 1992)).  Defendant, in support of its challenge to plaintiff's standing to bring its claims, relied on more recent precedent, the Federal Circuit's decision in Starr, to argue that plaintiff's claims were derivative claims, not direct claims.  Plaintiff, notwithstanding its citation to First Hartford and a footnote in a case discussed in First Hartford, did not attempt, in any meaningful way, to explain why Starr should not be applied and followed in this case.  Because plaintiff's reliance on First Hartford as support for a shareholder's standing to bring direct claims is cursory and undeveloped, the court is within its discretion to deem this argument waived.  See SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006) (noting that the court has discretion on whether to consider undeveloped arguments).

Even if this argument were not waived, the Federal Circuit's Starr decision remains the binding precedent most on point.  In Starr, the distinction between direct and derivative claims brought by shareholders is the focus of the Federal Circuit's standing analysis.  856 F.3d at 963-73.  Just as here, the plaintiffs brought takings and illegal-exaction claims related to a government intervention, during a financial crisis, affecting the future of a corporation in which they owned shares.  Id. at 958-61.  Starr provides the test for determining whether such claims are direct or derivative in nature and requires that nominally direct claims—that are actually derivative claims—be dismissed for lack of standing.  Id. at 973.

---

[25]  As defendant notes, claims brought on behalf of the Enterprises are asserted in numerous shareholder derivative claims in these related cases.

In the face of this binding precedent, the court cannot conclude that the holding in First Hartford, which concerns direct Fifth Amendment takings claims, is more relevant. It is true that in First Hartford shareholders of a bank in receivership could pursue their takings claims as direct claims against the United States. 194 F.3d at 1287. However, First Hartford does not address the distinction between direct and derivative claims. When faced with binding precedent that addresses a crucial distinction, such as Starr, and one that does not, such as First Hartford, the court follows the precedent most on point. Cf. Union Elec. Co. v. United States, 363 F.3d 1292, 1297 (Fed. Cir. 2004) ("[W]e have repeatedly held that the disposition of an issue by an earlier decision does not bind later panels of this court unless the earlier opinion explicitly addressed and decided the issue." (citing Boeing N. Am., Inc. v. Roche, 298 F.3d 1274, 1282 (Fed. Cir. 2002))).

In sum, plaintiff has not established that it has standing to litigate its claims because it does not, and cannot, demonstrate that those claims are substantively direct claims. Therefore, the court dismisses plaintiff's claims on standing grounds to the extent that it has subject-matter jurisdiction over those claims.[26]

## VI.  CONCLUSION

For the reasons stated above, the court **GRANTS** defendant's motion to dismiss and **DISMISSES** plaintiff's complaint because the court lacks jurisdiction to entertain its fiduciary duty and implied-in-fact-contract claims, and plaintiff lacks standing to pursue any of its claims. The clerk shall enter judgment accordingly. No costs.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge

---

[26]  As explained above, the court lacks jurisdiction over plaintiff's claims for breach of fiduciary duty and breach of implied contract. See supra Sections IV.B.1 (fiduciary duty), IV.C (contract). In addition, because all of plaintiff's claims must be dismissed for lack of standing, the court need not reach defendant's remaining arguments that these claims should be dismissed for failure to state a claim upon which relief can be granted.